## E. Domino Theory Of Pendent Jurisdiction:

) Suppose a cause of action A shares a common nucleus of operant facts with cause of action B which shares a different common nucleus of operant facts with C. Suppose A and C do not share a common nucleus of operant facts. Should A, B, and C be tried as one case or controversy?

) I ask the Court to find that the answer is yes, one falling of a sequence of dominoes is one case or controversy even if the first and last domino make no contact, provided that all intermediate dominoes are also joined to the case or controversy.

1  ) E. Denials Of Effective Access To The Courts For A Case
2  Are Causes Of Action Properly Joined   With That Case:

3  ) The State Of California, County Of Alameda, and their
4  Actors routinely, unnecessarily, systemically, substantively,
5  and with wrongful motivation, interfere with effective access
6  to the courts for all prisoners, with little legal cost to the interferers.

7  ) Joining the interferers as parties with explicit causes of action
8  for their interference has not been done before, that I know of. The
9  arguments made in A, — E. help to establish that it is proper to
10 do so.  It seems more legally solid to do it.

11 ) State Of California Courts by California Statute
12 must keep civil and criminal cases separate, and fail to
13 provide a procedure for Cross-Complaints in criminal cases
14 separate, and fail to provide a procedure for Cross-Complaints in
15 criminal cases.  This Federal Court, by Art. III §2 cl. 1 of the
16 United States Constitution, and the arguments made here in
17 A. — E., may join them as one Case or Controversy, and should
18 do so.  This is yet another reason for invoking §2254(b)(1)(B)
19 whether or not the state statute is constitutional for a court
20 empowered to hear claims of Federal Law (see Haywood v. Drown
21 (supra)).

22 ) The punitive and other damages appropriate for
23 interfering, or attempting to interfere, with effective access to
24 a court for a case depend on the specifics of that case.  The
25 calculation of damages constitutes a common nucleus of
26 operant facts with the case interfered with.

27 ) More than that, the request for relief in the form of
28 sanction is a request for the imposition of relief within the try-

1  ing of the case interfered with, and that makes it deeply inseparable

2  able from the case interfered with.

3  ) The interference is an assault on the inherent authority

4  of the Court to try the case, and the court with the jurisdiction

5  to try the issue of that interference is therefor the court with

6  jurisdiction of the case interfered with.

7  ) To illustrate the breadth of the effects of the interference,

8  the retaliation that was expressed as the siezure from me of 3

9  typewriters along with $384 worth of typewriter ribbons has

10  prevented my typing the pleadings in this case (with a few

11  exceptions), and affected 1) all of our causes of action and defenses

12  in this case and the State Court case Reiser v. Reiser RG08406864 Alameda

13  County Civil, 2) my appeal and habeas corpus for my criminal case,

14  3) our appeal in the Juvenile Court cases Alameda Count OJ06004835/6

15  and the collateral attack made on it herein.

16  ) The denials of counsel, the denials of access to my legal files,

17  the denials of communications, and other interferences with my

18  effective access to the also affect 1), 2), and 3), plus my criminal trial

19  defense.

20  ) Since the instances of interference have common nuclei of

21  operant facts, they should be tried together as one "Case or Controver-

22  sy".

23  ) For instance:

24  ) The prison system retaliation was motivated by a many

25  layered hatred with many improper motives felt by many of the

26  participants in the California Prison System hive mind, rather than a

27  unique motivation for each act of retaliation.

28  ) Proving that the vast majority of CDCR prisoners feel intim-

idated by decades or more of retaliation is relevant to the trying of each act of retaliation, as is their testimony that retaliation is the norm within CDCR. To prove those points will require extensive testimony that would be prohibitively inefficient to repeat multiple times.

) There has been interference with effective access to the courts by simultaneous denial of the effective assistance of counsel and denial of the ability to earn funds to hire counsel, for my children and myself, by the State Of California and the County Of Alameda and their actors. Please see my "Motion For Appointment Of Counsel" and "Petition For Writ Of Mandamus To Appoint Attorney" in <u>Alameda County Civil Case RG08406864 (Reiser v. Reiser v. et. al.)</u>, plus this Complaint sections B.II.5.b) Communications Denial Causing Counsel Denial and B.II.5.e) <u>Mempa v. Rhay (1967) 389 U.S. 128, 134</u> Failure To Provide Attorney On Appeal.

) Please consider all the conflicts raised in B.II as also applying to any proceeding to fund or appoint counsel, and that therefor this court should make the determination rather than       the State Of California/County Of Alameda courts making the determination.

) Each of the instances of interference is cumulative evidence of conspiracy, intent, and hive mind effects, painting a picture that becomes the clearer to see with each brush stroke, no single brush stroke having its full meaning made clear to a viewer seeking to assess its import alone from the others.

) The commonalities between all the instances of interference combines with not merely their inherent inseparability from

the causes of action interfered with, but each of the interferences affecting most causes of action, to create an added reason to hear all the causes of action that were interfered with as one Case or Controversy.

) 6. Enlisting a second person to simultaneously in parallel help right a sequence of dominoes can result in complications,

) Even assuming the courts have the coordination, I personally am unlikely to have the legal dexterity to handle the dominoes being in multiple courts with their deadlines colliding. I find that thought simply scary.

) My memories of the Juvenile Court Judges and the Criminal Court Judges each repeatedly pointing their fingers at the other Judge, and saying the witness tampering and witness kidnapping are the other Judge's jurisdiction, either not caring that the Judge they point to refused the jurisdiction, or being happy at it because it was never intended to be a fair trial, no Judge taking jurisdiction, are not merely unpleasant, but are also empirical evidence of the wisdom of the plain language of the U.S. Constitution.

) I recognize that the pay difference causes most of the competent judges to choose to become Federal Judges, and so they don't do such jurisdiction shirking games, but I hope that the Court will weigh the pages in this section, and their contents, and not risk adding years to the trial and the appeal process by splitting the case. I believe that the months spent writing this section, and your time spent reading it, will reduce the total quantity of litigation required by these causes of action.

## Notice Of Related Cases:

Alameda County Civil Case RG08406864
Reiser v. Reiser v. et.al,

People v. Reiser Alameda County Docket #154825,

Appeal and Habeas Corpus From #154825 (supra.),

my writs in #154825 (supra.) including S188957
and its "Motion To Enforce Separation Of Powers In
Determining Filing Of Documents By This Court" now
pending before the California Supreme Court, and its
companion writ "Petition For Review To Enforce
Douglas v. California" (denied by the California Supreme
Court) that I now bring to this Court (delayed by the
California State Action that I complain about herein in
doing so, the 90 day time limit was reached while I was in
Ad-Seg deprived of all my legal materials due to the
lower bunk chrono related retaliation),


Juvenile Court (Alameda County) Case Nos. OJ0600483516
(pertaining to my custody of my children),

all directly pertain to this case, and constitute its
subject matter. Armstrong v. Brown
resulted in a Court Injunction on January, 2007, for which

1    my assertion of my rights under that order contributed
2    to the retaliation I experienced ( I asserted my "lower bunk
3    chrono", and recieved disciplinary action) severely affecting ᵗʰᵉ
4        the proceedings in the above noticed cases excepting
5    0J0600-4835/6 .

6
7
8        Please see the "Grounds For Jurisdiction" section
9    herein for detailed facts and arguments as to the relation of
10   the cited cases to this case.

11   <u>David v. Brown  USDC EDC CV-09-0092-CMK</u>
12   relates to my denial of effective access to the court
13   claims, especially the denial of access to laptops and
14   the lack of a security justification for it. Mr. David is
15   a security expert, and intelligent, and I suspect his claim
16   is well drawn (but the prison won't make a copy of it
17   for me to read, so I base this notice on a conversation
18   with Mr. David.) (Mr. David is likely to be called as
19   a witness regarding the prison library and prison
20   staff retaliation           and denial of effective
21   access to the courts.   He would be both an eyewitness
22   and an expert witness.)
23   <u>Birdwell v. Cates, et.al.; 2; 10-CV-0719-KJM-GGH P</u>
24   relates in that it describes retaliation by the same prison staff
25   for litigating against prison staff; like me Mr. Birdwell was
26   transferred to a less desirable prison by  Captain desiring to
27   get rid of the litigators, and using the same false pretext for it.
28   Mr. Birdwell has additional information on that topic of value.

# CLAIMS:

## State Actors Interfered With My Effective Access To The Courts

### They Refused To Make Copies.

Ms. P. Castillo ran the law library and copier access at P.V.S.P., then Ms. Solis did. Miss Hammond ran them at M.C.S.P.

### Ms. Castillo Copied Only First 50 Pages Of Motion With Large Record

On 2/14/11 Ms. P. Castillo refused to copy more than the first 50 pages of my "Motion To File Petition By Houston v. Lack". She advised me to send in the motion without the complete petition as it was last attempted to be filed, which would not have been a legally valid motion, and without the complete record for the writ, which is a bad idea under California Law generally, and especially for this petition particularly, in which the size of the record is due to clerks confusing and mis-stating the record while repeatedly trying to violate Houston v. Lack (supra) in different ways as they try to procedurally default it, though legally they cannot.

The petition is the one that is the subject of Grounds For Jurisdiction: B., and is attached to the motion.

The motion and its attachments contain so many incidents of interference with effective access to the courts, and so many different violations of Houston v. Lack, that they ballooned a normal size writ to well over 100 pages. It now has the complexity of a 1000 piece jigsaw puzzle. While if you think that I missed any deadline I dispute that, and ask to be allowed to brief on any procedural default you suspect was colorably valid, it is ultimately a Gordian knot. While they endeavoured

so mightily to procedurally default me, they had already procedurally defaulted themselves due to the State Legislature's having anticipated such antics in the phrasing of C.C.C.P. §170.3. Only you have jurisdiction properly over it now, which I ask you to take, over all issues in the motion and petition. After ordering that a copy be sent to you, rule.

I hope that you will find the antics to merely constitute a hive mind extravaganza of due process denial helping to make my case that reform is called for, including reform by computer automation, see later.

Ms. Castillo is not a judge, clerk, or member of the State Bar. Her actions herein described violate the separation of powers defined in the California and Federal Constitutions between branches, states, and federation. They constitute a state imposed, mandatory, ineffective, assistance of counsel, violating Business and Professions Code (California) §6068, in addition to all else.

## Ms. Castillo Delayed and Refused Copying Affecting <u>Reiser v. Reiser.</u>

On 2/28/11 I needed to copy and mail the following legal documents in the case <u>Reiser v. Reiser (supra.)</u>, but was not allowed to go to the law library to copy them, and get envelopes for them until 3/3/11. (This was despite my being on the "Priority Legal User" list which is supposed to allow me to go to the law library even on "lockdown", "shortage of staff", or "modified program" days.): a) "OPPOSITION TO PLAINTIFFS' DEMURRER TO DEFENDANT'S ANSWER", b) "OPPOSITION TO PLAINTIFFS' DEMURRER TO DEFENDANTS' CROSS-COMPLAINT", c) "Draft Response To Be Used Only If Court Will Not Grant Me More Time To Compose My Answer (2/28/11)".

Ms. Castillo has de facto control over who on the P.L.U. list is actually allowed to come to the law library when the yard is not open, and exercises that control to retaliate against those

1  in mates who file complaints, including myself, by allowing them to
2  come less often, or not at all.
3      On 3/2/11, due to lack of copier access, I had to write a motion
4  asking for a continuance of the hearing, in triplicate by hand, which
5  further delayed my legal work which was already behind.
6      I distinguish my claim for the value of my time due to
7  wrongful interference with access to the courts from attorney's
8  fees (which pro pers have ~~usually~~ been unable to obtain).
9      The 3/2/11 continuance motion was received by the Judge the
10 morning of the hearing, he said.
11     On 3/3/11 Ms. P. Castillo copied a) and c), and refused to
12 copy b).
13     I believe and allege that a) and c) did not arrive in time
14 for the hearing on 3/9/11, but I remember the State Court
15 Judge was so angry that I was not allowed to get enough
16 words in edgewise to make a proper inquiry as to what was
17 received, or tell him what had been sent.
18     It was a crucial hearing that went badly for me, causing me
19 actual injury.
20     Lack of court website access means that to this date (7/17/11) I
21 don't know when a) and c) were received, or if they were received, or
22 if the clerk classified them in a way so as to prevent their being
23 read by the judge as with other motions (see later).  There was
24 another continuance motion filed earlier for that hearing that I never
25 received a ruling on, and can't check why.
26     On 3/7/11 Ms. Castillo delayed my copying an enhanced opposition to
27 the demurrer to my Response until 3/8/11, knowing and intending that that
28 would ensure that it would not reach the State Court in time.  If

electronic filing had not been interfered with, or I had been allowed to bring it to the hearing as I have seen Alameda County lawyers do, it could have been accepted with the permission of the Court for consideration at the hearing, but then it would not have been late at all if I had a laptop to speed my drafting through automation.

The State Court granted the demurrers with 30 days leave to amend.

I worked very long hours on the Response during those 30 days, and then she refused to copy it on 4/6/11.

I then worked on my Cross-Complaint which she refused to copy on 4/8/11. As of 7-19-11 neither Response nor Cross-Complaint was copied.

I had to spend 2+ hours in the morning of 4/6/11 writing a motion for amended response acceptance, which was wasted by her refusal to copy, and then had to spend the rest of what became a miserable 14 hour day writing in triplicate a motion dealing with her refusal to copy the response so that it could be considered filed that day. (This was an actual injury, this waste of my time.)

<u>Ms. Castillo Delayed Copying An Earlier Version Of This Complaint.</u>

On 3/8/11 I was worried (correctly) that I needed to file in this Federal Court before the State Court ruled against me, so I rushed together an earlier version of this complaint. I told her I needed it copied before my hearing on 3/9/11. It had a Grounds For Jurisdiction section that was well developed, but the claims regarding the prison were very rough. She delayed copying it until after 3/9/11.

<u>Captain Herrera refuses to "get involved" in copying decisions.</u>

By Title 15 §3162(e) "The authority to place restrictions

1  on duplication services for any reason as described in this section

2  shall not be delegated to staff below the level of correctional

3  captain.   The reasons for any restrictions on the services provid-

4  ed an inmate shall be documented on a CDC Form 128-B (Rev. 4.74)

5  General Chrono, and placed in the inmate's central file." Calif-

6  ornia Code of Regulations dated 1/1/11.

7       When said regulation was cited to her, Captain Herrera did

8  not care.  She said copying is Education, and she was not

9  going to "get involved." The refusals to copy were not documented.

10

11  Ms. Solis Refused To Copy My Reply On 7/15/11 (Re: Mot-

12  ion For Court Order To Copy Response And Time And Court Guidance)

13       Please see the attached witness statement by Lance W. Green

14  which I attest is true, and allege.  The Reply was 2 man days

15  of work, and was important.  Sabotaging an effort to obtain relief

16  from prison interference with effective access to the Courts  by delaying

17  a Reply's copying (it was copied on 7/18/11) enough to affect it's receipt

18  by the Judge by the time of the hearing is, well, evidence, of a

19  pervasive attitude throughout CDCR, and that is what she did.  By statute it

20  had to be mailed on 7/15/11.

21

22  P.V.S.P. Staff Refuse To Make A Copy For Me To keep.

23       When composing legal documents, one commonly needs to attach

24  other documents to the document.  To preserve an intelligible

25  record, which appellate courts require one to do, one needs to

26  have an intact legal document with all its attachments and

27  its proof of service as it was sent to the court, plus one

28  needs to remove the attached documents after copying to

1  put them back in their place in the record.   Failure to do that leads
2  to failures to find the attached documents when looking for them, which
3  has happened to me more than once (e.g. the Court Order granting
4  me a minimum of 5 hours per week of law library access which the
5  State Court said in a hearing was still protecting me, but was
6  not, which led to much wasted effort, relying on the State Court's
7  words, to try to get the prison to give me a copy and "adhere" to it,
8  and also a lack of protection from the prison). One also needs
9  to revise pleadings after they are filed, keeping a copy of each
10 version as it was filed.  For these reasons, prisoners need a copy
11 for themselves, but P.V.S.P., including Ms. Castillo, won't let us have
12 one, nor will Ms. Solis.

13      Computer automation and e-filing would cut through this
14 like a Gordian Knot, see later.

15

16 <u>P.V.S.P. Staff Won't Make Copies To Send To Lawyers.</u>
17      Lawyers are sometimes necessary to effective access to the courts,
18 and are a 6th Amendment right.
19      Not being able to send them copies has affected my correspond-
20 ence with Mr. Fuery of the Hearst Avenue Legal Foundation, Mr.
21 Michael W. Bien of Rosen, Bien, and Galvan, and Vincent Quan of the
22 Prison Law Office.
23      It makes it infeasible to send them any legal document which
24 either is currently being worked on, difficult to replace, or has a
25 time constraint which might possibly be violated by a busy un-
26 paid attorney generously donating time to a prisoner grateful to get
27 what help he gets.
28      As a result, I was not able to share this Complaint with Mr. Fuery

1  before filing, though I am sure he would have had insights, and
2  I could not send copies of 602's to the prison overseers (the
3  Prison Law Office and Rosen, Bien, and Galvan), regarding Armstrong
4  ng (supra.), which reduced my ability to maintain a proper
5  paper trail (see appeals process abuses later herein), and timely
6  inform them of conditions.    Email to lawyers could cure this.

7
8  ## There Are Many More Refusals To Copy Than Space Allows.
9      There were refusals and delays in copying by Miss Hammond,
10 at M.C.S.P.   There were refusals and delays in copying affecting
11 other prisoners (e.g. David),
12     I allege that my experiences evidence a systemic pattern of
13 conduct based on wrongful motives.   I can supply more data-
14 points if asked by the Court; I hope these suffice for induction.

15
16 ## Ms. Castillo's Actions Are Motivated By Retaliation.
17    Ms. Castillo is known for being retaliatory, and inserting
18 herself into litigation, with a special interest in litigation affect-
19 ing prison staff.  She is known for reading legal work, and getting
20 on the phone to discuss it with other prison staff.
21    I filed 602's complaining of her reading my legal work,
22 discussing it with inmates and staff, inserting herself into the
23 602 process, and deciding whether to copy based on whether she
24 thought it was correct.  Then I made her a defendant in Reiser
25 v. Reiser v. et. al.'s Cross-Complaint.  My complaints were true.
26    My complaints were followed by her retaliation, as with many
27 other prisoners.  ~~Reiser v. Reiser~~
28    That makes her conduct consistent with CDCR staff generally, see

1   the Civil R.I.C.O. section, for which the generalization matters to the claim.

2      Ms. Castillo on 4/6/11 advised me to just pay off my wife, so
3   that she would testify to help me, and says "I mean, let's be practical!",
4   and talks about how sometimes you just got to ~~be~~ pay people off,
5   and looks around at her clerks approval of her "wisdom".

6      I told her that I once let a lawyer get me to lie, and I have been
7   unhappy about that for a long time.

8      She makes another remark in favor of subborning perjury, it
9   is not getting the expected approval from me, and then says she
10  was just kidding (she wasn't). (She didn't use the word "perjury".)

11     Then she informs me that she won't copy my Response
12  until the next day (and does not in fact copy it then).

13     I have difficulties socializing with such people. They tend to
14  hate me, and to seek to prove I'm not so special by finding ways to hurt
15  me.      They use my lack of integration with their hive mind to victimize me.

16     By imposing ineffective assistance of counsel upon me upon pain of no
17  copies, CDCR has incurred an obligation to provide the costs of effective assist-
18  ance of counsel, or at least, effective access to the Courts.

19     <u>The Mailroom Refused To Mail My Cross-Complaint, Etc.</u>

20     I attempted to mail my Cross-Complaint's contents in <u>Reiser v.</u>
21  <u>Reiser (supra.)</u> to the Victim's Compensation and Government Claims Board, and
22  to mail numerous other documents in the case, especially to the oppos-
23  ing party, and the M.C.S.P. mailroom refused to mail them except if
24  they were going to the Court.   The State Court was unwilling to mail
25  them for me. ~~To Reiser to~~

26     I was an indigent incarcerated prisoner.
27     The refusals to supply postage were contrary to law.

28

<u>CDCR Staff Generally Seek To Burden Access To The Courts</u>
<u>Every Little Way They Can Devise To Do So, As Do Jail Staff.</u>

They limit our access to paper, pens, envelopes, in myriad different ways, with the burdens being greatest for those who need the access to the Courts most (reception, Ad-Seg).

I was also deprived of postage, paper, pens, envelopes, telephone access, in ways affecting my effective access to the Courts, by the staff at P.V.S.P., S.Q.S.P., Santa Rita Jail, and North County Jail, during the times I was at them.

Jail staff used my safety as a pretext for burdening my effective access to the Courts by encumbering my communications, with such devastating consequences for me that when I came to S.Q.S.P. I was afraid to go SNY because I thought that there would be a continuation of using a pretense of concern for my safety, and I remained in an environment where I was being threatened and attacked for being too friendly with blacks accordingly. This was reinforced by inmates telling me that SNY prisoners were being kept in "reception" for 2-3 years, and my knowing that conducting my appeal was infeasible under the burden of the restrictions on communications that exist in reception. Being jumped by 5-6 "soldiers" directed by the Aryan Brotherhood, as happened, was not as dangerous to my welfare as being unable to go to the law library and call attorneys. It wasn't until the counselor promised to send me to M.C.S.P. within a week that I agreed to drop my request to be put back in the mainline, and go SNY. My odds were better in a fight with a dozen or more opponents than in an appeal/habeas corpus with an hour and fifteen minutes a week in the law library, and my decisions

1  reflected that.
2      In understanding that to not be mere hyperbole, please consider
3  that my inability to change lawyers due to communications denials
4  had at that point cost me all that mattered to me.  See my
5  "Motion To Appoint Attorney" generally, and my section in it
6  titled "Communications Denial Causing Counsel Denial:" especially.  The
7  telephone burdens combined with my relatives not being willing to
8  trust that I knew good reasons for changing attorneys, and the DA
9  relayed my efforts to change attorneys to my lawyer, and I could
10 not quite accomplish the change.  A better man would not have
11 hesitated to say on the phone, so that the DA could play it for the
12 jury, that his lawyer wanted him to lie rather than spend the
13 time and money putting on the experts for 3 weeks to make the
14 honest defense, when I had no money to pay the cost of that honest
15 defense, and those relatives were warning me that a public defender
16 was something their friend who was a judge had warned against,
17 and why.  A tape recording of that exists, of those warnings, of the
18 refusals to make phone calls for me to find another attorney, etc.,
19 all on jail recorded phone calls for the DA to share with my lawyer as
20 he did.  The "Motion To Appoint Attorney" was made in Reiser v.
21 Reiser (supra), and I am asking you to take jurisdiction over it.
22 There probably also exists recordings of my telling my mother
23 about how DuBois my defense lawyer wanted to corrupt me in
24 the visiting booth at North County Jail, (and my mother advis-
25 ing me that that would be good for me.)  I say that because
26 the next day, (even though they had advised me that unlike
27 Santa Rita Jail the North County Jail visits were not recorded,)
28 Mr. DuBois made a reference, to him and Mr. Tamor being

"masters of corruption" that would teach me, that was incongruous unless the DA had also shared that with them, inspiring the remark. (So as not to exaggerate things, let me note that the white supremacists at S.Q.S.P. had no black belts among them.)

## The Cumulative Effect Of All The Acts To Reduce My Effective Access To The Courts Has Stymied All My Litigation.

It was like being attacked by a gang, no one of which could overcome you, no one of whose blows could drop you, but together they did, and now each says to the judge that what he did did not cause you to fall.

Legally, all members of the gang are liable for your going down, even if no one of them could have caused it.

Gangs of muggers do less damage than deniers of access to the Courts, and to apply a different standard to the CDCR staff and organization (some of whom even called themselves "The Green Wall Gang" I am told by inmates) would violate the equal protection clause of the State and Federal Constitution.

As a result of the interference I have lost my freedom, my children, my business, and society has lost my ~~scientific~~ charitable and scientific work.

Let us not forget the argument of the gang that if you had just handed over your wallet.... the State Court told me that if instead of complaining about the interference/retaliation/etc. I had just worked on my answer,.... and that was improper as a matter of law, and I seek relief in this Federal Court accordingly.

<u>Computer Automated Court Access Is Today Feasible And Reasonable For A Prison To Allow, And That Creates A Duty To Provide Its Effective Equivalent To Prisoners, Or It.</u>

<u>475 F.2d 475, Cruz v. Hauck (C.A. 5 (Tex.) 1973)</u> held that "prison regulations must not unreasonably invade the relationship of prisoner to the courts, without some persuasive governmental justification."... "But where, as here, a prisoner alleges that a particular restriction imposed upon him by the prison officials impinges upon his exercise of constitutionally guaranteed rights, it is incumbent upon us to carefully scrutinize the effect of the restrictions."... "It is clear that ready access to the courts is one of, perhaps <u>the</u>, fundamental constitutional right."

In <u>Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250 (1971)</u> the court noted that access to the courts, as guaranteed by <u>Johnson v. Avery 393 U.S. 483, 89 S.Ct. 747 (1969)</u>, "encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all the charges brought against him or grievances alleged by him."

Fair, in the above, as in sports, and I assert as in the State and Federal Constitutions' fair trial clauses, means that absent a compelling state interest (and perhaps not even then), no side should have a burden placed upon its litigation that is not placed upon the opposing side. The State has no legal compelling interest in denying computer automated access to the courts, (see later), it can only be said to have an interest in requiring it. The State Actors in the illegal R.I.C.O. Enterprise alleged later herein, as evidenced by their actions, perceive themselves to have an interest in denying computer access to the courts,

1   The Standard Of Effective Access To The Courts
2   Created By Computer Technology Is New:
3       Currently State Actors insert themselves into litigation
4   (albeit illegally) by pretending concern for the cost of photocopying
5   in matters in which hundreds of thousands of dollars (e.g, the
6   cost of keeping someone wrongfully imprisoned for years) are at stake.
7       With a computer, and e-filing, the cost of paper goes away.
8       Currently prison guards refuse to mail legal mail because they
9   are malicious, and spectacularly lazy.
10      With a computer, and e-filing, the issues raised in Houston v.
11  Lack (supra,) go away.
12      Currently State Actors ~~can~~ harass prisoners over legal files
13  taking up what they consider to be too much space.
14      With a computer, and a harddrive and backup hard drive, that issue goes
15  away, replaced by a pair of hard drives smaller than a Bible combined.
16      Currently State Actors provide inadequate law libraries with inadequate
17  hours of operation, which they exercise control over access to based on
18  malice, retaliation, discrimination, obstruction of justice, etc.
19      With a laptop or other computer used in the cell, and checked out
20  to each prisoner attempting litigation, 24x7 access to the best legal
21  references equal to those of any private attorney become feasible.
22      Currently State Actors decrease the social connectivity of prisoners
23  generally, and those exercising their legal rights (or needing to do so) against
24  ~~the~~ State Actors especially.  Almost all prisoners ~~need~~ lack a legal
25  education, and need social connectivity to learn how to effectively
26  litigate.
27      With social networking (including email and discussion groups and web pages)
28  software, prisoners can network to learn such things as how to subpena,

1  or why a Court is ignoring a request to subpena witnesses (a
2  problem currently perplexing me).

3      Most legally compellingly, State Courts currently communicate
4  much needed information solely by email and web page, rendering
5  those communications ex-parte communications. This has been done
6  extensively in <u>Reiser v. Reiser (supra.)</u>, with court rulings
7  appearing on the court website, the judge refusing to tell me
8  during Case Management Conferences when my motions are scheduled to
9  be heard or if they are scheduled to be heard, ~~and~~
10 ~~if they~~ and etc.

11     Alameda County Superior Courts Of California, and I presume
12 California Courts generally, in civil matters, implement essential court functions
13 like scheduling hearings and inquiries about what is in the record for the case,
14 via the Internet, and they are not willing to stop doing that when a
15 prisoner is a party, nor are they willing to perform sufficient
16 additional work to attempt to fix the problem adequately.

17     In <u>Reiser v. Reiser (supra.)</u>, rather than having his clerk do it,
18 Judge Keller has delegated to the opposing party the task of
19 providing me with communications from the court, some of
20 them, at times, often after their relevancy has expired ~~or it be~~
21 ~~comes~~ E.g. I was ~~even~~ told at a Case Management Conference
22 that the ~~can~~ State Court had issued a tentative ruling, which I
23 had not received, which the State Court would now conduct the
24 hearing for, and that the State Court would not read to me.
25 The implication was that the opposing party had received it.
26 The State Court refuses to send me the proofs of service for
27 its communications that I have not received, especially since I
28 want to compare them to my mail logs if they even have such proofs

1  (called, technically, certificates of mailing).

2  In _Reiser v. Reiser (supra.)_ the State Court has refused to send me
3  a copy of the record, which is available on the web via a conven-
4  ient interface the opposing party can and does use.

5  This would all be cured by my having a laptop with an
6  Internet connection to access the court website.

7  Not having that Internet connection has caused me many
8  actual injuries, including:

9  a) Not being able to prosecute my motion for protective order
10 because I cannot get it scheduled for a hearing, nor find out
11 why it has not been scheduled, not even by asking the judge
12 during a Case Management Conference.  This problem is severe
13 enough and intractable enough that my only remedy is this
14 Federal Court.

15 The State Court Judge has variously said that the motion for
16 protective order is something I should pursue via habeas corpus, then
17 at a later hearing said that if it pertains to effective access to his
18 court it is a matter for his court but refused to tell me anything
19 about its scheduling, or whether it would even ever be heard by
20 him, or why it had not been scheduled as I requested, or agree to
21 schedule it.  My solution is to come to this Federal Court.

22 b) Not being informed about the denial of a motion for disqualifica-
23 tion until ~~some~~ someone else sent it to me long after the 10 day
24 deadline for appealing the denial had passed.  The motion was
25 based on ex-parte communications.  My solution is to come to this
26 Federal Court.

27 ~~c) My motion to file a document disqualifying the~~
28 ~~California Judiciary was not copied~~ c) The inability to transmit the

1    documents Ms. Castillo ~~and~~ and other prison staff have refused to

2    copy.

3     d) My being unable to change lawyers prior to my criminal

4    conviction, due to my being unable to contact them by email and

5    learn about them on the web, and ask if they would work for publicity.

6     e) My being unable to learn that <u>People v. Lovercamp</u> (Cal. App 4 Dist.

7    <u>1974)</u>

8    ~~meant that~~ meant that the honest but embarrassing to the friends of my

9    defense lawyer defense was indeed a legally valid defense under existing

10    case law. ~~This~~ This had the effect of my not getting the ~~threat~~

11    ~~enter~~ encouragement that would have allowed me to tell my lawyer

12    to put on the honest defense, or leave the case. I just barely had

13    enough spine to tell him that I insisted he make it as it was. I just barely

14    lacked the spine to fire him over it, as he was telling me that he had 30

15    years of experience, and I needed to put myself "in the hands of the surgeon".

16    (Then he told me that there is case law making him the Captain Of The Ship,

17    and he, not I, got to choose what defense to make. I note that this

18    also is a denial of effective access to the courts, one that makes all

19    other Constitutional Rights illusory.) For more, see my Response in

20    <u>Reiser v. Reiser</u> (supra.), and my habeas corpus, and d) above.

21     f) My being unable to properly prepare <u>Reiser v. Reiser</u> (supra.), and

22    my criminal case appeal/habeas corpus, for pulling into this Federal

23    Court via the means described in the Grounds For Jurisdiction

24    section supra., due to the Response, Cross-Complaint, habeas corpus,

25    etc., being badly written. I write, and especially edit and

26    restructure, far more efficiently using a computer than pen and paper.

27     g) See my getting a 115 for not checking a court deadline because

28    I could not go to the court website in my section on Retaliatory Writeups.

h) Some of my motions were determined by the clerk to be "informal correspondence" (see the Alameda County Court website for details), and not set for hearing, without my being told of this. This caused actual injury, in that I believe those included "my 'motion for protective order", "Supplemental Brief For Motion For Protective Order", and "Ex-Parte Motion For Temporary Restraining Order" in <u>Reiser v. Reiser</u> (supra.), and my efforts to get them scheduled for hearing by means other than through the State Court website were to no avail (still), and I suffered from the resulting failure to protect, as described elsewhere herein, and in those motions by their necessary implications.

g) The lack of workflow automation software being applied to the prison grievance process, and the State Court's processes as applied to prisoners, enabled the numerous abuses of due process I have alleged, including pretended failures to receive, discardings, failures to schedule hearings, failures to transmit responses, time constraint abuses, refusals to provide status inquiry responses, retaliatory abuses of due process (I allege that h) above had a retaliatory component to it because of my complaints to the State Court about ex-parte communications, and my seeking the disqualification of the State Courts accordingly), and a lack of tracking that would enable easy proof of responsibility for receipt.

I allege that these problems are solvable, in proof of which I have identified one solution. That solution would not only not be a burden upon State interests, it would be a blessing upon State interests, increasing both security and efficiency dramatically, and facilitating in-cell education and rehabilitation as spinoff benefits. I imagine if those at the highest security levels, who most need it, could have education and access to the Courts.... Having identified <u>one</u> feasible solution, I have proven an obligation to provide <u>a</u> solution, to all the above.

<u>Prison Grievance Process Systemically Violates State And Federal</u>
<u>Due Process Constitutional Rights, And Interestingly, 18 U.S.C. § 1503.</u>

Please see D. in Grounds For Jurisdiction, and please consider "Factual Necessity Of An Independent Professional Judiciary As Specified By The Constitution Not Congress" to be this section's overview and introduction.

The cited Sacramento Bee article creates reason for belief that it will be possible to obtain the testimony of past insiders to the process, and that was a major factor in my deciding this was a winnable case to bring. Since then, CDCR actions have added to that belief, as has my growing understanding that you can't commit felonies against more than a hundred thousand people without ~~there being~~ evidence of it.

The article, the intentionality and systemic nature of it, and my experiences in filing prison grievances ("602's"), especially 602's about the denials of due process, are evidence of the awareness of the problem by the Defendants, and of their ratification of it.

Please see my prison and jail related causes of action in my Cross-Complaint in <u>Reiser v. Reiser (supra.)</u>

I ask the Court to consider that since the denials of due process have been made into barriers (or attempted barriers) to entry into the Federal Courts by the P.L.R.A., a denial of due process, especially if part of a systemic pattern and practice of denying due process, is an obstruction of justice violating 18 U.S.C. § 1503, and constitutes a R.I.C.O. predicate act. (In addition to which I invoke § 1983 and 552.1, see elsewhere herein.)

It is also grounds for imposition of sanction with the gravest consequences, for members of the CDCR R.I.C.O. Enterprise.

By use of screenout letters, Appeals Coordinators are able to reject 602's in a manner that cannot be appealed, and thus deprive a Federal Court of jurisdiction, or attempt to, in a way that a denial of the appeal cannot do.

<u>Abuses Of Screenout Letters:</u>

   <u>Attrition And Delay:</u> My First 115 (the one for being atta-
cked for being too friendly with blacks) has 18 stamps on it ind-
icating the number of times they made me resubmit it. First they
said there was too little documentation with it, then too much, then...
on it went.    They have consciousness of the impropriety of it,
because at the last level they removed all of the screening letters, which
was a denial of due process.   See 602 # SQSP-09-0298

   If you assume that each iteration of creating a task that
must be performed, even just the resending of it, for a normal prisoner
with a valid complaint subject to the usual prison chaos as he lives in
prison and is moved, etc., creates a 3% chance that it won't be resub-
mitted, that means that by creating 18 resubmissions they ensure
that less than half of valid complaints will make it through the
process. Requiring large numbers of submissions is their norm.
   By the time they do make it through, a large percentage of
prisoners will be released, and unable to sue, or will simply have long suffered.

   <u>Determinations That A 602 Is Not A 602:</u>  When the Appeals Coord-
inator has wrongfully issued a screenout letter, I have attempted to
602 that, which would create legal liability for the appeals coordinator if
I could make it past the appeals coordinator, and reach this Court. Acting as
her own judge in the case, the appeals coordinator in a screening letter
dated 10/22/11, determined that the 602 of the screening letter was
somehow not a 602 but was instead a "request for information", which
it was not, it was a complaint creating a basis for legal action once it has
exhausted the prison grievance process according to the P.L.R.A.   The PLRA
and CDCR jointly allow her to attempt to procedurally default the case aga-
inst herself, violating my due process rights (and obstructing justice),

1  In their screenout letter dated 11/12/10 they say "Your request for
2  interview appeal will not be addressed." By "request for interview"
3  they seem to mean that it is a request for information, though in fact it
4  was a complaint.
5      When I 602'd their failure to respond to some of my 602's on
6  11/24/10, concerned that my 602's had simply been discarded (see later for
7  why that was a reasonable concern), they screened out my 602 as a request for
8  information in their screenout letter dated 11/30/11. They did this des-
9  pite it containing a complaint of a threat of retaliation by Lt.
10  Barroga. (Lt. Barroga threatened to sieze more of my property
11  if I did not drop my complaint about the siezure of my property.)
12  Complaining of the screenout was to no avail, and in a screenout
13  letter dated 12/9/10 I was told "Do not resubmit this Request for
14  Interview issue, as it will not be returned to you."
15      They employ this pretense of determining that a 602 is a request
16  for information, and thus improper in their pretextual view, ~~even~~ with 602's
17  that contain explicit requests to be paid damages. That is evidence of bad
18  faith.
19  <u>The Cancellation Of An Appeal Is Supposed To Be Appealable But</u>
20  <u>They Were Not:</u> They say that cancellations of appeals may
21  be appealed, but when one appeals a cancellation of an appeal they
22  <u>screenout</u> the appeal with the words "This appeal has been appropri-
23  ately cancelled." This was done in their screenout letters dated 11/29/10,
24  12/9/10, and 10/28/10.
25  <u>Screenout Letters Often Wrongfully Contain A Decision Based On</u>
26  <u>The (Alleged) Merits:</u>  A screenout letter prevents taking an appeal
27  to the next level of the appeals process (which is an attempt to bar
28  access to Federal Court). The screenout letters just mentioned are