1   <u>Denial Of Due Process For 128's:</u>

2      I was told by an inmate first (to my puzzlement at the time),
3   and then later by Lt. Clendenin during the hearing on my writeup
4   for "Behavior Which Might Lead To Violence" dated 2/19/10 (described
5   elsewhere herein) which he made into a 128, that many prison staff
6   view 128's as more damaging than 115's because it is harder to get
7   them out of your C-File to prevent a parole board from seeing
8   them.

9      This has the interesting implication that the prison staff think
10  that their writeups are sufficiently wrongful that ~~prohibit~~ they
11  would be removed if fairly reviewed.

12     I claim merely that that is their thinking, not that they are
13  entirely accurate or inaccurate in their thinking, for the relevance
14  is to evidence of malice, conspiracy, consciousness of guilt, and denial
15  of due process.

16     There are factors that make it more accurate than may be at
17  first apparent.

18     First, note that they used the phrase "Behavior Which Might Lead
19  To Violence" to describe the 128, meeting the some evidence standard re: parole.

20     Second, when one appeals a 128, unlike a 115 or any other 602, there is
21  no third level of review which is performed by a person outside the
22  local prison.   The more distant the social connections composing a hive
23  mind, the less reliably coherent it is, and members of hive minds seek to
24  localize their improper processings accordingly.

25     Third, and most bizarely confirming, I have received second level reviews
26  of 128's that say that the 128 is just an information that a staff member
27  felt or said something, and denying my appeal on those grounds, refusing to
28  reach the issue of whether I had in fact committed a wrong.   This sub-

1  stantiates that the prison staff have a basis in the de facto
2  implementation of the appeals process for believing that 128's are not
3  removable/appealable, to the same extent that 115's are.   This is not
4  a concession that the appeals process is effective for 115's, but rather
5  an allegation that they have a special pattern to denying due process
6  for 128's.

7      CDCR has a progressive discipline policy, and that means that
8  legally 128's are in fact punishments legally, not mere information.
9  Additionally, denials of parole matter more than any other punishment.

10      I allege that this problem is systemic throughout CDCR.

11      For these reasons, all negative 128's not heard by an independent
12  professional jurist should be removed from the C-files of all California
13  Prisoners, as they are unreliable evidence that it would be a denial of due
14  process for a parole board to consider.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  <u>Some Claims Made Herein Are Of Violations Of More Than One Law.</u>

2      Wherever herein I allege one of 1) interference with effective access to
3  the Court(s), 2) obstruction of justice, or 3) violation of the inherent
4  authority of the court, I allege all of those.

5      Where those acts were in relation to a State Court, I also allege
6  violation of C.C.C. § 1209(a)8 (invoking pendent jurisdiction). Lack of
7  law library access prevents my researching a Federal Court equivalent, if one
8  exists then I allege it in relation to acts in relation to this Federal Court,
9  perhaps that equivalent is simply "obstruction of justice."

10      Since it has always been my intention to pull this case into
11  Federal Court, and I announced that early on in the case, acts in
12  relation to the State Court cases relate to a pending Federal Court
13  proceeding.  I note that "pending" has been found to include under
14  investigation for possible filing in Federal Court, when interpreting
15  obstruction of justice law.   Taken as a whole, the acts alleged
16  to obstruct justice have greatly delayed my filing in this Court.

17
18

19      All acts to obstruct justice in this case have been performed 1)
20  under color of State Law, and 2) under color of official right, by
21  State Actors.

22      Those acts were also intimidation by threat of violence and
23  intimidation and coercion (see C.C.C. §51.7 and §52.1) (please see elsewhere
24  herein my argument that when surrounded by guards who will in fact shoot
25  you if you resist, actions under color of official right are intimidation by
26  threat of violence) and interference with the exercise or enjoyment of rights
27  secured by the Constitution or laws of the United States, or of the rights secured
28  by the Constitution or laws of California (see C.C.C. §52.1).

1   Since the extortion was motivated by retaliation, where I allege extor-

2   tion I allege retaliation,

3   The retaliation was intended to deter me from complaining to a

4   court and to law enforcement officers of a deprivation of my civil rights.

5   Where I allege retaliation I allege violation of

6   §136.1 (invoking the doctrine of pendent jurisdiction).

7   Where I allege retaliation I allege witness intimidation and

8   victim intimidation and witness tampering and obstruction of justice.

9   C.C.C. §52.1 and the doctrine of pendent jurisdiction makes all acts

10  to obstruct justice in this case under color of official right actionable, and

11  so I invoke it.

12  Section 1983 makes all Federal Law violations in this case actionable, and

13  so I invoke it.

14

15

16

17

18  <u>Citing Civil R.I.C.O. Offers Arcane Legal Advantages:</u>

19  I was at first reluctant to use R.I.C.O. because its use

20  against persons cloaked in governmental authority makes one sound

21  delusional, and I am sensitive to that.  Mr. David convinced me

22  that its case law has advantages, especially against judges and law

23  enforcement, compared to §1983.   The Court is encouraged to extend

24  the R.I.C.O. case law to §1983, and eliminate the undermining of §1983

25  by powerful interests, to the extent it can, but I hope it understands

26  my choosing to use both §1983 and Civil R.I.C.O. for all acts to

27  which they can be applied (R.I.C.O. has restrictions), I request that

28  they both be applied to all acts in this case to which they may be applied.

1   Civil R.I.C.O. — Systemic Retaliation For Complaints

2

3      The California Department Of Corrections and Rehabilita-
4   tion, its staff, and management, are an enterprise within
5   the meaning of 522 U.S. 52 Salinas v. United States (1997) and
6   R.I.C.O. 18 U.S.C. §1962, that engages in systemic retaliation
7   for complaints by prisoners.

8      As a R.I.C.O. enterprise it violates 18 U.S.C. §1513 and
9   18 U.S.C. §1503 by retaliating against witnesses, victims, and
10   informants all throughout all California Prisons, in a systemic
11   pattern of conduct that creates a climate of fear, intimi-
12   dation, and suffering of injuries suffusing throughout all of
13   those prisons.

14      As a R.I.C.O. enterprise it violates 18 U.S.C. §1503 by obs-
15   truction of justice and interfering with effective access to
16   the courts in a systemic pattern of conduct throughout all
17   California Prisons.

18      Some of the acts of retaliation are siezures of property
19   under color of official right that constitute extortion violat-
20   ing 18 U.S.C. §1951.

21      These violations of 18 U.S.C. §1513, 18 U.S.C. §1503, and
22   18 U.S.C. §1951 occurred as at least two separate predicate
23   acts establishing a pattern of racketeering activity.

24      The enterprise affects interstate commerce: the extortion
25   of my typewriter on 10/13/10 seriously harmed my ability to
26   communicate intellectual property (I am an internationally known
27   computer scientist, and an entrepeneur, who developed the Reiser4
28   filesystem which was 2-4x times faster than the next fastest

1  Filesystem in the world.   My handwriting is slow and poor,
2  creating simultaneously an unprofessional impression, and an
3  annoying inconvenience for the reader.   I am currently doing work
4  in fundamental physics that I have a need to communicate to
5  funding sources, and to scientific journals read by those who
6  advise the funding sources.   The specificity of my reputation
7  to computer science makes the unprofessional impression more of
8  an issue for my physics work (and legal work) than it would be in
9  computer science and industry.   Lack of access to computers is one
10 motivation for not staying in the field that I am established in —
11 another is the importance of the new work, which will exceed the
12 economic impact of doubling filesystem performance by more than
13 one order of magnitude. ( Though my arrest has paralyzed the
14 commercialization of the filesystem work, I should disclose, details on
15 request.)) across state lines, and the enterprise engages in
16 interstate commerce.
17        The retaliation/extortion affected my property interests in
18 that my property was siezed on 10/13/10 (typewriter, TV,
19        typewriter ribbons, etc., approx. $920 total cost at a time of
20 severely constrained cash flow, creating a disproportionate to cost impact
21 of the criminal act), by C.O. Alexander at M.C.S.P.
22        The retaliation, obstruction of justice, and interference
23 with effective access to the courts has damaged my
24 business Namesys Corporation by depriving my business of
25 myself due to my continued incarceration when I would other-
26 wise have been able to secure my freedom, and it has
27 deprived me of monies that I would have been able to obta-
28 in via legal action, some of them from the defendants.

1   The vast majority of prisoners in California
2   prisons have been successfully intimidated into not
3   filing complaints, and the effects of this permeate every
4   aspect of their lives.

5   <u>Retaliation For Complaints Of Predation By "Cellies"</u>
6   As an example of the seriousness of the effects of
7   the retaliation, prisoners continue living with cellies who
8   threaten to hurt them, beat them, steal from them, rape
9   them, and more, all because they are afraid of retaliation
10  from the prison guards if they file a formal written complaint
11  asking to be moved for safety reasons.

12  The guards are often too lazy to agree to move
13  prisoners. The worse of a predator it is that they are
14  being asked to move, the more unwilling they are to
15  make the move because they are that much more desperate
16  to find someone to put him with. The more of a
17  vulnerable seeming victim that attracts predatory behaviors
18  a prisoner is, the more unwilling they are to move him,
19  because he is more likely to have requested many moves. The
20  more a prisoner is different from the criminal norm,
21  the more difficult it is for him to get a cell move, because
22  of being disliked by both prisoners and guards for being
23  different, and being more likely to have requested many previous moves.

24  Some guards are evil, and enjoy creating conflicts. The
25  work does not attract nice people, and CDCR makes no apparent
26  effort to screen out evil applicants, nor does it make any
27  apparent effort to avoid the work transforming guards
28  into evil persons, despite having a duty to do so, and despite

<u>Grounds For Jurisdiction:</u>

   This case arises under Article III Section 2 Clause 1 of the United States Constitution.

<u>Overview Of Jurisdictional Issues:</u>

   There are these main issues of jurisdiction:

   A. <u>44 U.S. 236 Cary v. Curtis (U.S. NY 1845)</u> is the original case finding that Congress determines the jurisdiction of the District Courts.

   Did <u>128 S. Ct. 2229, 553 U.S. 723 Boumediene v. Bush (U.S. 2008)</u> and <u>129 S. Ct. 2108 Haywood v. Drown (U.S. NY 2009)</u> implicitly abrogate <u>Cary v. Curtis (supra,)</u> when the abuses of <u>Cary v. Curtis (supra,)</u> that the minority presciently predicted back in 1845 shocked the conscience of the majority 150+ years later?

   Should this District Court <u>explicitly</u> recognize the abrogation, and what effect on this case and controversy will be had from embracing the wisdom and prescience of the justices Story and McLean explicitly now that we have, sadly, the empirical proof it in our generation?

   B. Should a wrongful death lawsuit, whose answer attacks the validity of the conviction,

1  the existence of published literature on the topic highlighting
2  this hazard (e.g. a book on "The Lucifer Effect" has been written
3  by a Stanford professor, lack of Internet prevents a proper cite).

4      In an incident distinct from the siezure of my typewriter
5  on 10/13/10, on 7-24-10 I personally had a typewriter from
6  another inmate that I was using siezed from me, typewriter ribbons
7  siezed, paper siezed, and books from the library (that I was subse-
8  quently charged for) siezed. (• One of the two books eventually
9  came back to the library, reversing the charge, and one did not.)
10  The siezures were caused by my persisting in asking C.O.
11  Grzebyk to not cell me with Hopkins, who threatened me
12  with violence when they moved me into his cell on 7-24-10.
13  Then when I continued to insist on being unsafe in the cell with
14  Hopkins, I was threatened with being sent to the hole, and when
15  I added words to their "marriage" chrono about how I was signing
16  it under duress, and was not safe in the cell, (see my legal logs for more
17  detail, in case R08406864), and etc., I was sent to the hole on
18  7-24-10 at M.C.S.P. by Lt. Buckner, and my altered version of the chrono
19  disappeared — never to be seen again.
20      The guards know I use the typewriters for suing prison staff.
21  I have been unable to retain one for any substantial time.

22      Not only is my being thrown into the hole to retaliate for my com-
23  plaining of threats to my safety not exceptional, in the California Prisons
24  it is their standard practice that when a prisoner complains about being
25  victimized by his cellie, the complaining victim is normally the one
26  thrown into the hole, not the perpetrator.  This violates the law, badly.

27      Prison guards discourage prisoners from demanding to be moved
28  by insisting that they must identify the reasons for

1  wanting to be moved within the hearing of other prisoners.
2  They do this knowing and intending that this will cause
3  them to be identified as "snitches" by the other prisoners if they
4  press their complaint (that the guards want them to drop).   They
5  know that those other prisoners have a significant percentage
6  of criminals who partake in a culture of criminal conduct in
7  which "snitching" is a very serious taboo.   They know that
8  "snitches" are commonly attacked, stabbed, killed, made into pariahs,
9  etc.   Thus the guards engage in life endangering retaliation
10 by proxy against those who simply want  to be in a safe
11 cell, using criminal inmates as their proxies.
12      This was done to me when I asked to be moved out
13 of a cell with a paranoid delusional inmate named
14 Johnson, who spent hours threatening to hurt and kill
15 me in many different ways.  The threats were escalating
16 in their intensity, and in the physical proximity of the
17 threatener. C.O. Garcia demanded that I say why I wanted to be
18 moved, as a condition of being moved, while requiring that this
19 conversation occur through the cell door as my cellie and neighbors
20 listened, doing so on 4-16-10 at Mule Creek State Prison.  I
21 was also threatened with being sent to the hole, though, very
22 unusually, by threatening to sue them for retaliation I was able to
23 get them to not carry out their threat that time.
24      I gave C.O. Guzzman a 602 concerning my needing
25 to be moved; he discarded it; I 602'd him for discarding
26 it; I was told that if I did not end the 602 I
27 would be sent to the hole "for my safety" by Sergeant
28 Cooper. "My safety" was a pretext for a threat of

1  retaliation.

2      This threatening of prisoners with their safety being
3  "protected", if they don't drop complaints asking to be moved, by
4  their being moved to the hole, is the normal practice
5  throughout the California Prisons. (It affects property.)

6      I dropped the 602 against Guzzman, and 602'd Sergeant
7  Cooper on 6/9/9, regarding the above. Another Sergeant
8  threatened me with retaliation, and I dropped the 602.
9  They moved me, but now the M.C.S.P. prison guard brass
10 had it in for me.

11     They chose my cellies; they gave me many
12 predators for cellies; they claimed I was the problem.
13 They did not let me choose my cellies.

14     This was especially hellish in that I have to
15 avoid getting "115's" for "mutual combat" if I want to
16 get paroled, and I want to get paroled. They put me in a
17 cell with one predator after another, and I could not
18 even risk defending myself if I wanted to be paroled. It
19 was a special form of hell.

20     Then I filed a 602 asking for an end to all
21 double-celling throughout the California Prisons, citing
22 94 F.3rd 1191 Jensen v. Clarke (C.A. 8, Neb. 1996), and the 8th
23 Amendment.

24     Requiring inmates to sleep in the presence of other
25 inmates is inherently unsafe to an extent that violates the
26 8th Amendment, the cruel and unusual punishment clause of the
27 California Constitution, and my 14th Amendment right to enforcement of
28 that California Constitutional right.

1    The reader could be forgiven for thinking that double
2  celling is comparable to living in close quarters in the military,
3  and thus not a violation of the 8th Amendment. The problem is
4  that double-celling does not involve living in close quarters with a marine,
5  these guys do not have the mental capabilities of a marine, double-celling
6  involves being forbidden, under penalty of never being paroled, from
7  protecting yourself from a succession of predators with anger
8  management serious problems, kleptomaniacs, drug addicts who buy pills from
9  other inmates and when they have nothing left to sell for the pills will start
10 selling your stuff, StMers who get off on beating people up and letting other
11 people know it, paranoid delusional cellies who become convinced that you
12 are staring at them and watching them and talking other people into
13 conspiring against them, and cellies who lack the mental capacity to tune
14 out what another person in the same cell is doing so that each act,
15 even the clipping of toenails, is to them an assault on their consciousness.
16 The last is probably the most common issue of all; these guys lack
17 the mental capability required to tune out anything their cellie is
18 doing. They just can't do it, and if you have the mental focus
19 required to read a book, this may be hard to appreciate.
20    I have sat at a table where one inmate discussed his view
21 that his cellie was deliberately provoking him by clipping his toe-
22 nails in the cell while he was there, because of the noise that
23 makes. I tried to suggest it wasn't an intentional provocation,
24 and the third inmate at the table said I was wrong, if the guy was
25 clipping toenails it was a deliberate provocation. That is representative
26 thinking for many of these guys, and for those of us with the mental
27 focus required to read a book on the subway, it requires an effort to grasp
28 what their problem is. They cannot filter. They just can't. They

1 lash out. People without the mental focus to read books go nuts when
2 placed in a small cell with someone they are mentally incapable of
3 tuning out, and they become dangerous.

4    Whether we speak of the prisoners of Nebraska, as described in
5 Jensen v. Clarke (supra,), or the prisoners of California, they should
6 never have been put two to a cell. Being raped, beaten, terrorized,
7 murdered, etc., exceeds both their sentence, and the boundaries set
8 by an 8th Amendment whose interpretation is being made by a
9 civilized society, as in Plata v. Brown

10    It is harder on an SNY yard to avoid in-cell predators than
11 to avoid predators on the yard, far harder, in my experience.

12    Those struggling to not be predators, and some of them are strug-
13 gling and trying to change, find it much harder because of double-
14 celling. Do we really need to corner people within their mental
15 disabilities, or can we in our society allow prisoners to
16 cease to be predators by choosing to avoid the conditions that they
17 know endanger their efforts to stay clean and reform who they are?

18    To add to this the retaliation, for victims just trying to get
19 out of the way by moving away from a predator, that is something
20 evil, something against the law.

21    It is my belief that the above provides a much more solid
22 legal basis for reducing prison overcrowding, and reducing it
23 by a larger amount, than Plata v. Brown (supra,), and this
24 was a motivation in the retaliation.

25    The retaliation substantially delayed all my litigation, and
26 made it all come at a substantial price. If I don't win this
27 litigation, the retaliatory 115's will probably turn my 15-to-life
28 sentence into life not 15 years. A rational actor would not take

1  that gamble.  That is part of why no one has,   The systemic
2  retaliation has enabled these massive widespread gravely serious crimes,

4  <u>Retaliatory  Writeups  Threatening  Never Being Paroled:</u>

6  <u>"Manipulation Of Staff:"</u>
7       In rules violation report C09/10-034 dated  9/15/2010
8  "Manipulation Of Staff/Misuse Of Medical Documentation" it
9  says:
10      "Inmate REISER G31009, 239U is receiving this
11  report for manipulation of staff, by using a doctor's order
12  for his own convenience."
13      It cites as the violated rule  Title 15 §3013, which reads:
14  "3013. Unlawful Influence
15      Inmates shall not attempt to gain special consideration or favor
16  from other inmates, employees, institution visitors or any other person
17  <u>by the use of bribery, threat or other unlawful means.</u>" [underlining added]
18      The report then ~~comes~~ uses quotes from me to ❶ establish that I
19  failed to assert my "lower bunk chrono" until 9/15/10 because:
20      ❶a) "changing [to] random cellies is dangerous"
21       b) "the cellie I had was safer than the average at this institution."
22       c) "I feared for my safety if I did."
23       d) "it's not my responsibility" (see below for why)
24      A lower bunk chrono entitles one to sleep in the lower of two bunks
25  in a double-cell.
26      The report quotes C.O. Gonzalez, who issued the report/115/writeup:
27  "This chrono was only brought to my attention because his cellmate was ~~moving~~
28  being moved to accomodate another inmate with bottom bunk chrono."

1  My cellie's lower bunk chrono had expired.
2  They were moving someone else into the cell to take the lower bunk.
3  I proposed that I take the lower bunk, that my cellie and I just
4  flip bunks in the cell, and I asserted my lower bunk chrono,
5  It was the efficient thing to do. My cellie was agreeable to
6  this, and at first so was C.O. Gonzalez.
7  Hearsay has it, and I believe and allege it, that it was
8  Sergeant Reyes who became upset, decided that I'd created
9  enough troubles over cell moves, said so, and directed C.O.
10 Gonzalez to issue the 115.
11 The report/115/writeup was signed by Sergeant Reyes,
12 Lt. Barroga, Captain Kaplan (typewritten name), H. Hetter(A)(4)
13 [the "r" in "Hetter" might be a different letter, and the meaning of "(A)(4)" I
14 don't know], someone with an illegible signature, and C.O. Gonzalez,
15 all of whom I hold to be jointly liable.
16
17
18 The writeup/115/report does not allege facts that constitute a
19 violation of Title 15 §3013 Unlawful Influence, I did not violate it,
20 and any reasonable independent jurist hearing the matter would have so
21 found.
22
23 In Armstrong (supra) an injunction was filed on Jan. 18, 2007
24 ordering Defendant CDCR as follows (on page 6 lines 2-7 of the injunction):
25 "Defendants shall develop, implement, and begin to use a statewide,
26 computerized, networked real-time tracking system to track prisoners
27 with disabilities by May 30, 2007. This system shall include
28 prisoners' disability designations and the disability accomodations

1   they require, including but not limited to lower bunks, ..."

2       CDCR was in fact using pieces of paper conveyed by
3   inmates that were kept in binders in the housing build-
4   ings, and those pieces of paper were what the guards in
5   the buildings that house the prisoners relied on when moving
6   prisoners around.

7       There was also a system involving computers that
8   was not in the housing buildings.

9       It is an interesting question, to what extent was the
10  computer system a Potemkin Computer System, or perhaps
11  even a Potemkin Virtual Village. Being careful to attest
12  to what I know, I can say that the pieces of paper
13  were what I observed the guards to rely on, and what
14  the retaliatory writeup is a confession of their relying on, for
15  the tracking of lower bunk and lower tier chronos, and perhaps
16  more.

17      Pieces of paper kept in binders do not constitute a "state-
18  wide, computerized, networked realtime tracking system".

19      I do not have a responsibility to aid and abet the
20  perpetration of a fraud upon a Federal Court. The
21  Federal Court Injunction makes it not my responsibility
22  to track my lower bunk chrono, it makes it the responsibil-
23  ity of CDCR to do so by particular means that it specifies
24  explicitly that do not involve _my_ acting to do it with _paper_.

25      There is a legal difference between a right and a
26  responsibility. They retaliated for my exercising a right
27  under _Armstrong (supra.)_ (and the other laws cited herein), by
28  creating a pretextual responsibility that they would not care

1  about in the slightest normally (because it really is my right not

2  my responsibility), but it expresses, in double-talk they know a

3  prisoner will decipher clearly, their retaliation, and deterrence.

4      To interfere with the exercise or enjoyment of a right, under

5  color of official right, including by taking away freedoms, proper-

6  ties, typewriters, etc., and especially by doing so in a prison envir-

7  onment where one is surrounded by guards with guns <u>who will</u>

8  <u>in fact shoot you</u> if you resist any such interference, is an

9  interference by threat of violence (and a coercion).  I ask you

10  to find that those who wrote the Federal Law On Extortion, when

11  they made color of official right legally equivalent to threat of

12  violence, were expressing an accurate understanding of their deep

13  equivalence, for legal purposes, and extend the legal logic to C.C.C. §51, §52, §51.7, §52.1.

14      The writeup/115/report constitutes:

15      a) A confession of contempt of court for failing to adhere to

16  ~~disregard~~ the court injunction cited above.

17      b) A confession of retaliation for my asserting my rights under

18  that order, and under the lower bunk chrono.

19      c) A confession of retaliation for asserting my rights under

20  California and Federal Law to receive a reasonable medical accom-

21  odation.

22      d) An act of intimidation directed at the entire class of

23  persons affected by <u>Armstrong (supra,)</u>

24      e) An act of discrimination against a person with a medical

25  condition requiring a reasonable accomodation by law.

26      f) An "attempt to interfere by threats, intimidation, or coercion,

27  with the exercise or enjoyment of rights secured by the Constitution

28  or laws of the United States, or of rights secured by the Constitution

1 or laws of this state" which under California Law is a cause of
2 action (C.C.C§51, C.C.C§52, including especially C.C.C§51.7, and C.C.C§52.1)

4     g) An act of retaliation for my past complaints, and
5 attempts to access the courts, including complaints of endanger-
6 ments and threats to my safety in violation of the 8th Amendment,
7 and complaints of interferencence with my effective access to the
8 courts, and including my past complaints of unsafe cellies.
9 Please note the prominent quoting of my safety concerns in the
10 writeup, indicating that they were voiced, and the voicing was punished.

11

12

13   The consequences of the retaliatory writeup:
14     a) I was punished by having a writeup placed in my
15 "C-file" that has a substantial likelihood of preventing my ever being
16 released from prison given current parole board practices.  This
17 punishment is a retaliation dwarfing all else excepting the interfer-
18 ence with my effective access to the courts, and thus release.
19     b) "30 days loss of behavioral credit"
20     c) "30 days loss of Privileges, Yard" which loss affects
21 access to the courts and thus my ability to obtain my release, the
22 return of my children, and the relief sought from the defendants in
23 my lawsuit.
24     d) "30 days loss of Privileges, Phone"
25     e) I was placed on C-status, which means being confined to
26 my cell except for 2 hours a day Mon.~Fri., being fully confined
27 in the cell on weekends, having to shower and wash clothes and exercise
28 and go to the law library during that time, being fully confined on

1  holidays, the discomfort of no showers on weekends and holidays
2  (subject to their shower every 72 hours rule), and the pressures from other
3  inmates over my needing a shower (simple prisoners are often very smell
4  focussed).  This affected my access to the courts.
5     F) My RCA flat screen TV, new Swintec 2410cc AX-150 typewriter,
6  48 typewriter ribbons (12 2-pack containers contained 24 of them),
7  TV antenna, and fan, totalling ~$920.  They went well beyond
8  their usual practice at M.C.S.P. in the scope of what they
9  siezed.

10
11     CDCR normally practices "progressive discipline", in which
12  one receives first a verbal warning, then a 128 counseling chrono,
13  and then a 115, for acts of a similar character. As "discipline," there
14  had been no progression. As retaliation for complaints, there had been
15  a progression from verbal warnings to 115's to a short trip to the
16  hole to C-status and transfer to a less desirable prison.   That
17  constitutes evidence of retaliation, and connects all of those events
18  into a whole — into a pattern of racketeering.

19
20  <u>Law Library Related Retaliatory Writeups — Factual History</u>
21  <u>Leading Up To Them:</u>

22     In violation of Federal Law

23

24  I was being made to choose between access to the law library, showering,
25  and exercise (see elsewhere herein for more on that).

26     I chose law library. ~~(illegible)~~
27     As a result, I had acquired a reputation for smelling bad. I
28  also had a medical condition causing me to often have gas,

A prisoner clerk in the library decided to glory in loudly attempting to degrade me over it on two occasions separated by about 2 days in October 2009. If I recall correctly, the first time I did pass gas, and the second time he falsely accused me of it. The second time I did not take his rebuke with the seriousness he felt it deserved, so he said something about how he'd meet me on the yard. ~~xxxxxxxxxxxxxxxxxxxxxx~~

I loudly said "go get your 115 with the help of someone else" (I find that line actually works), and walked away from him to go sit down at the computer in the law library.

I would have thought that this would cause him, not I, to attract the ire of the prison staff member running the library (Ms. Hammond), but in fact I was the one she became angry at, for not taking her clerk seriously (when he threatened me with violence), and for being an educated person not taking a fellow uneducated person seriously (invidious discrimination)

I find it unintuitive how little most people care about supporting right vs. wrong, and how much they care about supporting those who stroke them and resemble them.

I was denied access to the law library at times when I was entitled to it. I filed 602's over that against both her, and the guards she involved in it. The retaliation escalated in seriousness from there, manifesting as both denials of access to the law library, and writeups endangering my ever being paroled.

Experienced inmates all throughout this advised me against filing the 602's because of the retaliation that would result. Their predictions were accurate, and evidence the systemic nature of retaliation in California prisons.

1    For infractions of equal alleged severity, the egregiously right
2  get punished much more severely than those who were wrong. Those
3  who are right are more threatening to the social network's
4  (legally, the R.I.C.O. enterprise's) power structure than those who are
5  wrong. The more legally correct I was in the disputes the more
6  punitive they were.

7    This tendency of hive minds, including the CDCR R.I.C.O. enter-
8  prise, to punish the right more than the wrong, is an additional
9  evidence that the Framers were wiser in having hearings conducted
10 by independent professional jurists than those who later sought
11 to "innovate" via the P.L.R.A. returning the determination of the
12 law to the hive minds the Constitution's Authors failed to convince
13 some that it should be taken from.

14    I subsequently received writeups from Ms. Hammond in relation to:
15   a) Claiming that a deposition is a court proceeding under California
16 Law (It is.), thus constituting a court deadline that, by the statute
17 making it a court proceeding, and Title 15, entitled me to be a "Priority
18 Legal User" for the 30 days prior to the deadline.

19   (Being a "Priority Legal User" substantially affects my ability to get
20 into the law library, and get copies made. That it has the import-
21 ance it has reveals a deeper problem, see elsewhere herein.)

22    While making this claim, I spoke calmly and quietly, but
23 did not concede my legal argument. I have learned that when I
24 speak calmly and quietly and in contradiction to some people, it
25 is observable that they "go nuts" on me, perpetrating invidious
26 discrimination while violating my legal rights. Elsewhere in this
27 litigation I will discuss this more generally — Miss Hammond is a
28 supporting data point for the existence of this pattern.

1   My calm speech was written up as "Behavior which might
2  lead to violence" violating rule §3005(a) of Title 15.

3   In so doing Ms. Hammond nicely demonstrates that a rule
4  prohibiting "Behavior which might lead to violence" is unconstitution-
5  ally vague for the reasons articulated in <u>178 Cal. Rptr. 796, 30</u>
6  <u>Cal. 3d 375, People v. Mirmirani, (Cal. 1981)</u>, and <u>Lanzetta v.</u>
7  <u>New Jersey (1939) 306 U.S. 451, 453, 59 S.Ct. 618, 619</u>. Please
8  note that the discriminatory application of the law that
9  <u>Mirmirani (supra,)</u> was concerned could result from vague laws is
10 exactly what occurred here. I cite the due process clause of the
11 State and Federal Constitutions. It is also unconstitutionally spec-
12 ulative, based on the same authorities.

13   It also violates my right to petition for the redress of
14 grievances, and my free speech right under the State and Federal
15 Constitutions.

16   At the time of this writeup Miss Hammond had been named as
17 a defendant in my Cross-Complaint in <u>Reiser v. Reiser v. et. al. (supra.)</u>
18 The writeup was dated 2/19/10.

19   My conduct lacked criminal intent. Please consider whether
20 the phrasing of the rule fails to require criminal intent, and could,
21 for instance, be used to prohibit talking to persons of other races when
22 on a yard with white supremacists, or any other flavor of being egregiously
23 right. See my discussion of mens rea later herein.

24   I have been informed and believe that a few months before
25 I received this writeup the guards suddenly started heavily using
26 this phrase "Behavior which might lead to violence", out of a desire to
27 maximally damage the parole chances of inmates, for actions that
28 would otherwise be irrelevant to parole boards. That is evidence

of conspiracy.

Please see "Denial Of Due Process For 128's", which has information specifically about this 128, and about evidence of conspiracy, malice, and consciousness of guilt, plus the substantial impact of 128's for lifers.

b) Miss Hammond gave me a writeup for attempting to serve a subpena on her, and had me ejected from the library for it on 3/27/10 when I made the attempt. The writeup alleged that by use of the words "just for the record, I have attempted to serve you, and you have refused..." I was attempting to "intimate" [sic, I believe she meant "intimidate"] her.

I spoke in a calm manner, and my physical presence and actions projected calmness, during this, there was nothing about them from which a threat perception could derive, it was the subpena itself that angered her.

Her accusation of attempted intimidation was, since it manifested as a writeup affecting my paroling, an act of attempted intimidation against me by her, retaliation, and obstruction of justice, as is her calling staff to have me ejected from the library.

The library was located on C-yard at M.C.S.P., Ione, California.

c) Miss Hammond gave me a writeup for claiming on the morning of 6/4/10 that under California Law, being served with a notice of hearing creates a deadline even when the notice of hearing is sent from the opposing party not the State Court (It does.)

I had received such a notice at that time.